UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
┌─────────────────────────────────────┐
│ USDC SDNY                            │
│ DOCUMENT                             │
│ ELECTRONICALLY FILED                 │
│ DOC #: _____           │
│ DATE FILED: ___08/19/2022___         │
└─────────────────────────────────────┘
```

WILL ISNADY, *individually and on behalf of In re: Will Isnady (Debtor)*,

                        Plaintiff,

    -against-

VILLAGE OF WALDEN and VILLAGE OF WALDEN POLICE DEPARTMENT,

                        Defendants.

No. 21 Civ. 3730 (NSR)
OPINION & ORDER

NELSON S. ROMÁN, United States District Judge:

       Plaintiff Will Isnady brings this action against Defendants the Village of Walden and the Village of Warden Police Department under 42 U.S.C. § 1983, alleging a systematic and continuous violation of his civil rights. Specifically, Plaintiff alleges that Defendants selectively enforced state and local laws resulting in violations and stop work orders, wrongfully entered his property, failed to investigate and/or act on Plaintiff's complaints against their own violations of his rights, and denied him access to his own property and to other property in which he owns an easement, all based on his race (black) and national origin (Haitian). (Compl. ¶¶ 1–26, ECF No. 1.) Presently pending before the Court is Defendants' motion to dismiss Plaintiff's Complaint under Federal Rules of Civil Procedure 12(b)(1) and (6). (ECF No. 27.) For the following reasons, the Court GRANTS Defendants' motion to dismiss.

## BACKGROUND

### I. Factual Background

       The following facts are derived from the Complaint, as well as related court filings of which the Court takes judicial notice, and are taken as true and constructed in the light most favorable to Plaintiff for the purposes of this motion.

Plaintiff, a 52-year-old black male whose national origin is from Haiti, owns the property located at 154 West Main Street in the Village of Walden (the "Property"). (Compl. ¶¶ 13–16, 27–28, ECF No. 1.)

Walden Preservation, a non-party, is the current owner of the property known as 400 Cliff Street, also located in the Village, as well as of Cliff Street itself. (*Id.* ¶¶ 30–31.) Before Walden Preservation, the Village owned Cliff Street, during which time it was a public street open to vehicular traffic and where parking was permitted until August 3, 1978. (*Id.* ¶¶ 32–34.) Prior to August 3, 1978, the Property's previous owners (Plaintiff's predecessors) used Cliff Street to gain access to the Property's driveway. (*Id.* ¶ 35.)

On August 3, 1978, pursuant to an "Indenture," Cliff Street was transferred to Walden Housing Associates ("Walden Housing"), a nonparty, and became private property. (*Id.* ¶¶ 37–40.) The Indenture prohibits "[a]ny physical demarcation [that] shall be at the property line of the Navas[1] and Westerman[2] parcels." (*Id.* ¶¶ 40–42.) As a result, Plaintiff claims there is a "recorded easement" from Walden Housing to Plaintiff. (*Id.* ¶ 44.) Plaintiff also claims that there is an easement by necessity in his favor over Cliff Street as its transfer and privatization to Walden Housing removed Plaintiff's access to a public street from his driveway—that is because Plaintiff claims that he cannot access his driveway unless he travels over Cliff Street. (*Id.* ¶ 45.) On July 16, 2015, Walden Housing transferred its interest in Cliff Street to Walden Preservation. (*Id.* ¶ 46.)

A.    *Defendants' selective enforcement of the Municipal and Zoning Codes in 2001*

Beginning in 2001, Plaintiff received numerous violation notices and stop work orders concerning the Property, pertaining to alleged violations of the Village's Municipal and Zoning

---

[1] Navas is the State of New York's predecessor in interest to the property that includes the Walden Veterans' Memorial Bridge (Route 52). (Compl. ¶ 42 .)

[2] Westerman is Plaintiff's predecessor in interest to the Property. (Compl. ¶ 43.)

Codes. (*Id.* ¶¶ 48–49.) The alleged violations include issues regarding rubbish and unregistered vehicles located on the Property, as well as work allegedly being performed on the Property without a building permit. (*Id.* ¶¶ 50–51.)

Plaintiff alleges that Defendants selectively enforced the Municipal and Zoning Codes against him due to his race and national origin, prohibiting "certain uses" of the driveway on the Property. (*Id.* ¶ 52.) Plaintiff states that Defendants did not similarly enforce these codes against other properties in the same jurisdiction, and owners of other properties were not prohibited from such uses of the driveways located on their respective premises. (*Id.* ¶ 53.)

B.    *Plaintiff commences the Bankruptcy Proceeding in January 2015*

On January 12, 2015, Plaintiff commenced a Chapter 13 bankruptcy proceeding (the "Bankruptcy Proceeding") by filing a Petition. (*See* Knowles Decl., Ex. S (Docket Sheet for *In re Isnady*, Case No. 15-35042 (CGM) (Bankr. S.D.N.Y.)), ECF No. 28-19.) "Chapter 13 is directed to consumer relief so as to enable an individual debtor with regular income to develop and perform, under court supervision and protection, a plan for the repayment of his debts over an extended period of time, rather than opting for liquidation under Chapter 7." *Matter of Breuer*, 4 B.R. 499, 501–02 (Bankr. S.D.N.Y. 1980). Plaintiff amended his Petition on March 19, 2015. (*See* Knowles Decl., Ex. S.)

C.    *Defendants wrongfully enter the Property in June 2015*

On June 14, 2015, the Police Department entered onto the Property. (Compl. ¶ 54.) Plaintiff alleges that the Police Department's entrance was without cause and created a "disturbance," and that it intimidated Plaintiff and his tenants while on the Property. (*Id.* ¶¶ 54–57.) Plaintiff believes the Police Department selected the Property based on his race and national origin. (*Id.* ¶ 56.) On July 15, 2015, Plaintiff reported the incident in writing to the Office of the Village Manager, but

no actions were taken. (*Id.* ¶¶ 58–60.) Plaintiff believes that the Village's inaction was due to his race and national origin. (*Id.* ¶ 60.)

       D.     *Defendants failed to investigate a "hit and run" incident in August 2015*

On the evening of August 14, 2015, Plaintiff claims that two of his vehicles were vandalized and damaged in a "hit and run" type incident, in which an unknown third party plowed the two vehicles together and then left the scene. (*Id.* ¶¶ 61– 62.) Plaintiff believes the incident was recorded by one of the Police Department's surveillance cameras. Plaintiff called the Police Department and the New York State Police to make a police report of the incident. (*Id.* ¶¶ 63–65.)

When a New York State Police trooper arrived at the scene and inquired about the surveillance video, Plaintiff claims the Police Department lied and did not produce the video for the New York State Police. (*Id.* ¶¶ 65–66.) Plaintiff believes that the Police Department failed to investigate the incident and failed to produce the video based on his race and national origin. (*Id.* ¶¶ 67–68.) On August 17, 2015, Plaintiff reported the incident in writing to the Office of the Village Manager, but no actions were taken. (*Id.* ¶ 69.) Plaintiff believed that the Village's inaction was due to his race and national origin. (*Id.* ¶ 70.)

       E.     *Crowd gathering on the Property and refusal to grant access in November 2015*

On November 8, 2015, an estimated one to two hundred people gathered near the Property's driveway for a gathering at the adjacent local Veteran's Park. (*Id.* ¶ 71.) A portion of the crowd trespassed onto the Property and blocked its driveway. (*Id.* ¶ 72.) Three Police Department officers barricaded the crowd on the Property and refused to grant Plaintiff access to the Property. (*Id.* ¶ 73.) The crowd that gathered on the Property refused to leave and the Police Department did not force them to vacate the Property to allow Plaintiff to enter. (*Id.* ¶ 74.) Plaintiff left, and then returned to the Property, where the three Police Department officers continued to

4

deny him access or clear out the trespassers. (*Id.* ¶¶ 75–76.) The crowd refused to move after Plaintiff asked them to do so, and then began to yell slurs and curses at Plaintiff, telling him that he does not belong in this country because of his national origin. (*Id.* ¶ 77.) Plaintiff filed complaints about the November 8, 2015 incident with the Office of the Village Manager on November 8, November 9, and November 10, 2015. (*Id.* ¶ 78.)

       F.     *The Village enacts Local Law No. 1 of 2016*

On January 19, 2016, the Village enacted Local Law No. 1 of 2016, which Plaintiff claims had the effect of depriving him of the ability to park on Cliff Street. (*Id.* ¶¶ 79–81.) Plaintiff believes that this law was purposefully directed against him because of his race and national origin. (*Id.* ¶ 80.) Plaintiff claims the Village denies him parking and access onto Cliff Street, but permits others to park and stand. (*Id.* ¶ 81.)

       G.     *Defendants deny Plaintiff access to the sewer pipes on Cliff Street in March 2016*

On March 17, 2016, the Police Department, relying upon Local Law No. 1 of 2016 and the transfer of Cliff Street to Walden Preservation, prohibited Plaintiff from accessing and repairing the underground sewer line, which services the building on Plaintiff's Property. (*Id.* ¶¶ 87–89.) Defendants threatened to arrest Plaintiff on the account that he was trespassing on Cliff Street when attempting to have the sewer pipes repaired. (*Id.* ¶ 88.) Plaintiff believes that Defendants' conduct was based on his race and national origin. (*Id.* ¶ 89.)

       H.     *Plaintiff is denied access to Cliff Street in March 2016*

On March 18, 2016, Walden Preservation notified Plaintiff in writing that he was prohibited from accessing Cliff Street. (*Id.* ¶ 47.) Plaintiff claims Walden Preservation threatened him with trespass charges, for which it invoked the aid of the Police Department to enforce its perceived rights and preclude Plaintiff from accessing the road. (*Id.*)

I.      *Plaintiff is denied parking on Cliff Street in April 2016*

In April 2016, the Village painted striping on Cliff Street, denying Plaintiff access and right to park on Cliff Street. (*Id.* ¶ 82.) Plaintiff believes that this is due to discriminatory animus based on his race and national origin. (*Id.* ¶ 83.) Defendants cited Plaintiff for parking on Cliff Street at least twice, respectively on November 6, 2016, and November 5, 2017. (*Id.* ¶¶ 84–85.)

J.  *Plaintiff commences the State Action in October 2016, but all claims against the Village and its Police Department are dismissed in 2017*

On October 16, 2016, Plaintiff commenced a state court action against the Village, the Police Department, and the Walden Preservation in the Supreme Court of the State of New York, County of Orange (the "State Action").  (*See* Knowles Decl., Ex. J at 3 (*Isnady v. Walden Preservation, L.P., et al.*, Index No. EF007058-2016 (Sup. Ct., Orange Cnty., Vazquez-Doles, J.), ECF No. 28-10.) In the State Action, Plaintiff alleged that "as a result of the Village designating that portion of Cliff Street adjacent to [the Property] a fire lane, . . . [the defendants] den[y] Plaintiff any parking . . . on Cliff Street [for the Property]." (*Id.*, Ex. L at 3–4, ECF No. 28-12.) Plaintiff asserted six causes of action:

(1) against the Village and Walden Preservation for declaratory judgment granting [him] egress and ingress over the former Cliff Street to and from his driveway and allowing [him] and/or his tenants to park vehicles on the former Cliff Street area adjacent to [the Property];
(2) against the Village for compensatory and punitive damages for the impermissible taking of [his] [P]roperty;
(3) against Walden Preservation for compensatory damages for violation of [his] easement rights;
(4) against Walden Preservation for compensatory damages for the acts of the Police [Department] for acting under color of law to benefit Walden Preservation; and
(5) against the Village for violation of the Eminent Domain Law [sic] Procedure Law for depriving plaintiff of parking rights on Cliff Street; and
(6) for declaratory judgment quieting title pursuant to RPAPL Article 15 declaring that [he] has an easement upon the former Cliff Street for ingress and egress to his driveway and a 10 foot [sic] wide parking easement on the former Cliff Street adjacent to his property.

(*Id.* at 4).

On December 13, 2017, after the defendants moved to dismiss, the state court issued a decision and order dismissing all claims against the Village and Police Department and granting Plaintiff leave to amend two of the six causes of action against Walden Preservation. (*See* Knowles Decl., Ex. L at 2–8, ECF No. 28-12.) Additionally, the state court granted judgment against Plaintiff declaring that he did not have an easement, either express or prescriptive. (*Id.*)

Specifically, the state court first concluded that the language in the Indenture did not create an express easement because it merely described the area conveyed, and that it did not state or even imply "an intent to burden the conveyed property to the benefit of the Navas and Westerman parcels." (*Id.* at 6 ("An express easement is only created where there is a writing containing plan and direct language demonstrating the clear intent of the grantor to give the use of servient estate to the dominant estate for all time." (citing *Willow Tex, Inc. v. Dimacopoulos*, 68 N.Y.2d 963, 965 (1986); *Bogart v. Roven*, 780 N.Y.S.3d 355, 356 (2d Dep't 2011)).)

The state court further concluded that Plaintiff did not allege exclusive use of Cliff Street for parking needed for an easement by prescription, and instead, alleged the opposite: that Cliff Street was available for parking to him, his tenants, and the general public since before the Indenture. (*Id.* at 7 ("An easement by prescription is shown by adverse, open and notorious, contiguous, and uninterrupted use of the subject property for the prescriptive period." (citing *Vitiello v. Merwin*, 928 N.Y.S.2d 581, 583 (2d Dep't 2011)).) The state court also concluded that Plaintiff at best had alleged that any hostile use of Cliff Street begun in 2016, and thus, failed to satisfy "the prescriptive 10 year [sic] period under RPAPL § 311." (*Id.* at 7.) Plaintiff subsequently filed a notice of appeal on December 29. 2017. *See Isnady v. Walden Preservation, L.P., et al.*, Index No. EF007058-2016, Doc. No. 53 (Sup. Ct., Orange Cnty., Vazquez-Doles, J.).

*K. Bankruptcy Court issues discharge and Plaintiff commences Isnady I in March 2018*

The bankruptcy court issued a discharge order in the Bankruptcy Proceeding on March 2, 2018, deeming the Chapter 13 estate to be fully administrated. (*See* Knowles Decl., Ex. S.)

On March 26, 2018, Plaintiff commenced his first federal action under 42 U.S.C. § 1983 against the Village, the Police Department, and other individual defendants, in which he alleged that they systematically and continuously discriminated against him on the basis of his race and national origin ("*Isnady I*"). (*See Isnady v. Village of Walden, et al*, Case No: 7:18-cv-2662 (NSR) [hereinafter *Isnady I*], Compl., ECF No. 1 (S.D.N.Y. Mar. 26, 2018).) As in the instant action, Plaintiff alleged in *Isnady I* that the defendants selectively enforced state and local laws resulting in violations and stop work orders since 2001, wrongfully entered the Property, failed to investigate and/or act on Plaintiff's complaints, denied him access to and parking on Cliff Street, refused to disperse crowds trespassing onto the Property, and denied him access to the sewer pipes, all based on his race and national origin. (*Compare* Compl. ¶¶ 27–89, *with* Knowles Decl., Ex. B ¶¶ 27–93, ECF No. 28-2.)

*L. Bankruptcy Court closes Bankruptcy Proceeding; the Court dismisses Isnady I in July 2019*

On May 30, 2018, the bankruptcy court closed the Bankruptcy Proceeding. (*See* Knowles Decl., Ex. S.)

In February 2019, the defendants in *Isnady I* moved to dismiss Plaintiff's claims, arguing that Plaintiff lacked standing to file any civil suits as a debtor and that his claims were barred by judicial estoppel because he failed to disclose his claims in the Bankruptcy Proceeding while it remained pending. (*Isnady I*, ECF No. 44 (S.D.N.Y. Nov. 9, 2018).) On July 19, 2019, the Court issued an opinion and order agreeing with the defendants and dismissing *Isnady I* in its entirety for lack of standing and as barred by judicial estoppel. *See Isnady I*, 7:18-CV-02662-NSR, 2019 WL

3252753, at \*9 (S.D.N.Y. July 19, 2019). Specifically, the Court agreed held that Plaintiff had

failed to disclose his claims in the Bankruptcy Proceeding and that such failure did not result from

a "good faith mistake or an unintentional error." *Id.* at \*6. Plaintiff filed a notice of appeal on

August 14, 2019. (*Isnady I*, ECF No. 55 (S.D.N.Y. Aug. 13, 2019).)

> *M. Plaintiff seeks to reopen the Bankruptcy Proceeding in December 2019; Plaintiff loses the appeal of Isnady I's dismissal in April 2020*

On December 3, 2019, Plaintiff filed a motion to reopen the Bankruptcy Proceeding to

permit him to amend his Schedule B and Schedule C so that he could add the State Action, *Isnady*

*I*, and a separate personal injury claim unrelated to the instant action. (*See* Knowles Decl., Ex. O

at 2–5, ECF No. 28-14.) By consent order, the bankruptcy court reopened the Bankruptcy

Proceeding on April 1, 2020 (*see id.*, Ex. Q, ECF No. 28-17). The consent order provided that the

bankruptcy court was reopening the Bankruptcy Proceeding

> for the purpose of permitting [Plaintiff] to Amend Schedule "B" and Schedule "C" filed with his petition to include the following causes of action:
>
> 1. [the State Action], commenced on or about October 17, 2016;
> 2. [*Isnady I*], commenced on or about March 26, 2018; and
> 3. [the unrelated personal injury claim] . . .
>
> which the parties acknowledge are property of [Plaintiff's] Chapter 13 Estate and that any proceeds received therefrom shall be distributed to [Plaintiff's] creditors in accordance with the debtor's confirmed Chapter 13 Plan and the United States Bankruptcy Code, less any sums that are exempted by the debtor upon the filing of [Plaintiff's] Amended Schedule "C".

(*Id.*)

The next day, the Second Circuit issued an unpublished summary order affirming this

Court's ruling dismissing *Isnady I* in its entirety. *See Isnady I*, 799 F. App'x. 91, 92 (2d Cir. 2020)

(summary order) (unpublished). Specifically, the Second Circuit held that Plaintiff "waived any

challenge to the district court's determination that he lacks standing, because he neither raised nor

argued the issue in his opening brief." *Id.* And even assuming that he had not waived such arguments, the Second Circuit found that Plaintiff lacked standing because

> [d]espite knowing of the relevant causes of action by October 17, 2016—when [Plaintiff] filed his state court complaint based on the same occurrences underlying the present complaint—[he] failed to disclose these causes of action in his bankruptcy proceedings before his debt was discharged on March 2, 2018. The causes of action thus belong to the bankruptcy estate, not to [Plaintiff]. *Chartschlaa v. Nationwide Mut. Ins. Co.*, 538 F.3d 116, 122 (2d Cir. 2008) (stating that a debtor must "disclose all his interests at the commencement of a [bankruptcy] case" (emphasis omitted)). [Plaintiff] cannot "assert[ ] the rights or legal interests of others in order to obtain relief from injury to [himself]." *Rajamin v. Deutsche Bank Nat'l Tr. Co.*, 757 F.3d 79, 86 (2d Cir. 2014) (internal quotation marks and citation omitted).

*Id.*

### N.  Plaintiff amends his Schedule B and Schedule C in the Bankruptcy Proceeding in June 2020

Plaintiff amended his Schedule B and Schedule C on June 3, 2020 (*see id.*, Ex. R, ECF No. 28-18). On June 24, 2020, the bankruptcy court closed the Bankruptcy Proceeding once again. (*See* Knowles Decl., Ex. S.)

### O.    Defendants deny Plaintiff's application to post a banner in July 2020

On July 24, 2020, after Plaintiff applied to post a banner on the side of the building in the Property, Defendants denied his application. (Compl. ¶ 90.) Plaintiff claims that Defendants permit others to attach banners on the side of their buildings, particularly those who are white and not of foreign nationality. (*Id.*)

### P.    Plaintiff is denied access to Cliff Street again in August and November 2020

On August 10, 2020, Defendants physically blocked Plaintiff from entering onto Cliff Street, preventing him from accessing the Property. (*Id.* ¶ 91.) On November 8, 2020, Defendants again physically blocked Plaintiff from entering onto Cliff Street, preventing him from accessing the Property. (*Id.* ¶ 92.) Plaintiff claims that Defendants took no action to rectify the alleged

10

wrongs, and he believes that Defendants' conduct was based on his race and national origin. (*Id.* ¶ 89.)

> Q. *State Court dismisses Plaintiff's remaining claims in the State Action in 2021, and Plaintiff appeals*

On January 21, 2021, after Plaintiff amended his complaint and Walden Preservation moved for summary judgment, the state court dismissed all remaining claims against Walden Preservation. (*Id.* at 8–15.) Again, the state court found that Plaintiff had no property or possessory interest, including neither an express nor prescriptive easement, on Cliff Street that would entitle him to park on or use for ingress and egress. (*Id.*) On March 30, 2021, Plaintiff appealed the state court's decision, which to date remains pending. *See Isnady v. Walden Preservation, L.P., etc., et al.*, Index No: 2018-00268, 7058/16 (N.Y. App. Div. 2d Dep't.).

## II. Procedural Background

On April 27, 2021, Plaintiff commenced the instant action by filing a complaint. (Compl., ECF No. 1.) On July 8, 2021, Defendant sought leave to file a motion to dismiss, which the Court subsequently granted and issued a briefing schedule. (ECF Nos. 12 & 13.) After a series of extensions, on October 12, 2021, the parties filed their respective briefing on the instant motion: Defendants filed their notice of motion (ECF No. 27), memorandum in support ("Motion," ECF No. 29), declaration with accompanying exhibits (Knowles Decl., ECF No. 28), and reply ("Reply," ECF No. 33); and Plaintiff filed his response in opposition ("Response in Opposition," ECF No. 32) and declaration with accompanying exhibits (Haberman Decl., ECF No. 31).

## LEGAL STANDARD

## I. Federal Rule of Civil Procedure 12(b)(1)

A case is properly dismissed for lack of subject matter jurisdiction under Rule 12(b)(1) when the district court lacks the statutory or constitutional power to adjudicate it. *Makarova v.*

*United States,* 201 F.3d 110, 113 (2d Cir. 2000). The plaintiff bears the burden of establishing the existence of federal jurisdiction. *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560–61 (1992).

Where, as here, the jurisdictional challenges are raised at the pleading stage, the court accepts as true all factual allegations in the complaint and draws all reasonable inferences in the plaintiff's favor. *Sharkey v. Quarantillo,* 541 F.3d 75, 83 (2d Cir. 2008). It is "presume[d] that general [fact] allegations embrace those specific facts that are necessary to support the claim." *Lujan v. Nat'l Wildlife Fed'n,* 497 U.S. 871, 889 (1990) (alterations added). The court also may consider affidavits and other evidence outside the pleadings to resolve the jurisdictional issue, but it may not rely on conclusory or hearsay statements contained in affidavits. *J.S. v. Attica Cent. Schs.,* 386 F.3d 107, 110 (2d Cir. 2004), *cert. denied,* 544 U.S. 968 (2005). Indeed, courts "must" consult factual submissions "if resolution of a proffered factual issue may result in the dismissal of the complaint for want of jurisdiction." *Robinson v. Gov't of Malaysia,* 269 F.3d 133, 140 n. 6 (2d Cir. 2001).

## II.  Federal Rule of Civil Procedure 12(b)(6)

In deciding a motion to dismiss under Rule 12(b)(6), the Court must accept all factual allegations in the complaint as true and draw all reasonable inferences in the plaintiff's favor. *Freidus v. Barclays Bank PLC,* 734 F.3d 132, 137 (2d Cir. 2013). To survive a motion to dismiss, a complaint must contain "sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). Mere "labels and conclusions" or "formulaic recitation[s] of the elements of a cause of action will not do"; rather, the complaint's "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Twombly,* 550 U.S. at 555. In applying these principles, the Court may consider facts alleged in the complaint and documents attached to it or incorporated by reference. *Chambers v. Time Warner, Inc.,* 282

F.3d 147, 152–53 (2d Cir. 2002) (internal quotation marks and citation omitted).

## DISCUSSION

As a preliminary matter, the Court notes that a review of the Complaint reveals that the number of Plaintiff's claims and the legal bases for some of them appear vague or unclear. Plaintiff's opposition papers also fail to sufficiently clarify these matters.

Under Federal Rule of Civil Procedure 8, a complaint must "give the defendant fair notice of what the . . . claim is and the grounds upon which it rests." *Twombly*, 550 U.S. at 555 (citation omitted). The purpose of Rule 8(a) "is to provide fair notice of the claims and to enable the adverse party to answer the complaint and prepare for trial." *Highview Properties D.H.F. Inc. v. Town of Monroe*, No. 18 CIV. 867 (NSR), --- F. Supp. 3d ---, 2022 WL 2079085, at *8 (S.D.N.Y. June 9, 2022) (quoting *Strunk v. U.S. House of Representatives*, 68 F. App'x 233, 235 (2d Cir. 2003)). "Dismissal . . . is usually reserved for those cases in which the complaint is so confused, ambiguous, vague, or otherwise unintelligible that its true substance, if any, is well disguised." *Salahuddin v. Cuomo*, 861 F.2d 40, 42 (2d Cir. 1988).

Here, drawing all inferences in his favor, Plaintiff appears to assert four claims under 42 U.S.C. § 1983 and three claims under the Takings Clause against Defendants. First, Plaintiff seemingly asserts four *Monell* claims[3] against Defendants under § 1983 for the following alleged violations:

(1) violations of his rights under the Equal Protection Clause of the Fourteenth Amendment for selective enforcement of the Municipal and Zoning Codes that prohibited him from using the Property's driveway for certain uses beginning since 2001;

(2) violations of his rights under the Fourth Amendment for the wrongful entry into his Property in June 2015;

---

[3] A municipality can be held liable under section 1983 only where it "'subjects' a person to a deprivation of rights or 'causes' a person 'to be subjected' to such deprivation." *Connick v. Thompson*, 563 U.S. 51, 60, (2011) (quoting *Monell v. Dep't. of Soc. Servs. of City of New York*, 436 U.S. 658, 691 (1978)).

(3) violation of his rights under the Due Process Clause of the Fourteenth Amendment for denying his application to post a banner in July 2020; and

(4) violation of his rights under the Equal Protection Clause of the Fourteenth Amendment for denying his application to post a banner in July 2020.

(*See* Compl. at 5–12.)

While Plaintiff alleges in the Complaint, and argues in his opposition papers, that his constitutional rights were violated by Defendants' failure to investigate the "hit and run" accident and his numerous complaints (*see id.* ¶ 67; Resp. in Opp'n at 31), Plaintiff fails to indicate *which* of his rights were violated. As a matter of fact, that is "[b]ecause there is no constitutional right to an adequate investigation, and therefore a claim for failure to investigate is not independently cognizable under Section 1983." *Buari v. City of New York*, 530 F. Supp. 3d 356, 391 (S.D.N.Y. 2021) (citing cases).

On that same basis, insofar as Plaintiff asserts a similar § 1983 claim for failure to investigate based on his allegations that Defendants lied and failed to produce a surveillance video that recorded the "hit and run" incident to the New York State police, such claim is also not cognizable. Furthermore, insofar as Plaintiff claims that this same conduct violated his rights under the Due Process and/or Equal Protection Clauses of the Fourteenth Amendment, any such claim also fails. In fact, Plaintiff expressly alleges that it was the New York State Police who requested Defendants to produce the surveillance video—*not himself.* (*See* Compl. ¶¶ 65–66 ("[T]he New York State Police Trooper called [the] Police Department to inquire about the police surveillance video. Upon information and belief, the . . . Police Department lied to the New York State Police about the surveillance video and did not produce available video[.]").) Nor does Plaintiff even allege that the New York State Police made such request to Defendants on his behalf. As Defendants correctly point out, it is not as if Plaintiff alleges that he made a Freedom of

Information Law ("FOIL") request to Defendants for them to produce the alleged video and they later denied his request. (Mot. at 33.)

Plaintiff also seemingly asserts three claims under the Takings Clause for the following alleged unconstitutional takings by Defendants:

(1) enacting Local Law No. 1 of 2016 to deprive him for parking on Cliff Street despite his purported easement;

(2) denying Plaintiff temporary access to the Property in November 2015; and

(3) denying Plaintiff access to and parking on Cliff Street in March and April 2016, and in August and July 2020, despite his purported easement.

(*See* Compl. at 5–12.) In sum, the Court construes the Complaint to assert a total of seven claims: four under § 1983 and three claims under the Takings Clause. As such, the Court finds that Plaintiff's allegations and the language contained therein provide sufficient fair notice to Defendants with respect to the legal basis of these seven claims such that the relevant allegations are not "so confused, ambiguous, vague, or otherwise unintelligible that its true substance, if any, is well disguised," so as to warrant dismissal. *Salahuddin*, 861 F.2d at 42.

By the instant motion, Defendants seek to dismiss Plaintiff's claims for lack of subject matter jurisdiction on several bases, including lack of standing, judicial estoppel, and ripeness, as well as for failure to state a claim. (Mot. at 20–26, 29–33.) Alternatively, Defendants argue that Plaintiff's claims are barred under the doctrines of *res judicata*, collateral estoppel, and/or *Rooker-Feldman*. (*Id.* at 26–29.)

Accordingly, the Court must first address Defendants' challenge to subject matter jurisdiction and will only analyze their remaining arguments if the Court has subject matter jurisdiction over this case. *See Brokamp v. James*, 573 F. Supp. 3d 696, 703 (N.D.N.Y. 2021) ("Subject matter jurisdiction is a threshold issue and, thus, when a party moves to dismiss under

both Rules 12(b)(1) and 12(b)(6), the motion court must address the 12(b)(1) motion first." (citations omitted).)

Because Plaintiff asserts substantially the same claims here as he did in *Isnady I*, and Defendants argue that Plaintiff's claims here fail for substantially the same reasons they failed in that case, the Court first addresses Defendants' arguments on whether Plaintiff's new additional allegations here—namely, those concerning Defendants' denial of his application to post a banner on the side of the building in the Property in July 2020—are ripe.[4]

## I.    Ripeness

Defendants first argue that Plaintiff's claims about their alleged denial of his application to post a banner on the side of the building in the Property are unripe. (Mot. at 33.) Specifically, they contend that nowhere in his Complaint did Plaintiff allege that he submitted a formal, meaningful application to the Village to post such banner. (*Id.*) The Court agrees.

"To be justiciable, a cause of action must be ripe—it must present 'a real, substantial controversy, not a mere hypothetical question.'" *Nat'l Org. for Marriage, Inc. v. Walsh*, 714 F.3d 682, 687 (2d Cir. 2013) (quoting *AMSAT Cable Ltd. v. Cablevision of Conn.*, 6 F.3d 867, 872 (2d Cir. 1993)). "A claim is not ripe if it depends upon 'contingent future events that may or may not occur as anticipated, or indeed, may not occur at all.'" *Id.* (quoting *Thomas v. Union Carbide Agr. Prod. Co.*, 473 U.S. 568, 580–81 (1985)); *see also Dougherty v. Town of N. Hempstead Bd. of Zoning Appeals*, 282 F.3d 83, 90 (2d Cir. 2002) ("The ripeness requirement prevents a federal court from entangling itself in abstract disagreements over matters that are premature for review

---

[4] As to Plaintiff's new allegations that Defendants denied him access to Cliff Street in August and November 2020, the Court considers them together with Plaintiff's other allegations that Defendants similarly denied him access to Cliff Street in March and April 2016, because Plaintiff claims that all these acts are a set of continuous violations of his rights over a period of several years. (*See* Compl. ¶ 19; Resp. in Opp'n at 7–8.)

because the injury is merely speculative and may never occur, depending on the final administrative resolution.").

Claims involving a land use decision will be unripe "until the government charged with implementing the regulations has reached a final decision regarding the application of the regulations to the property at issue." *Williamson Cnty. Reg'l Planning Comm'n v. Hamilton Bank of Johnson City*, 473 U.S. 172, 186 (1985), *overruled on other grounds by Knick v. Twp. of Scott, Pennsylvania*, —— U.S. ——, 139 S. Ct. 2162 (2019). That is because "[a] final decision is 'a definitive position on the issue that inflicts an actual, concrete injury.'" *R-Goshen LLC v. Vill. of Goshen*, 289 F. Supp. 2d 441, 448 (S.D.N.Y. 2003), *aff'd* 115 F. App'x 465 (2d Cir. 2004) (quoting *Williamson*, 473 U.S. at 193). "The ripeness requirement of *Williamson*, although announced in a takings context, has been extended to equal protection and due process claims asserted in the context of land use challenges." *Dougherty*, 282 F.3d at 88 (collecting cases).

"A final decision exists when a development plan has been submitted, considered and rejected by the governmental entity with the power to implement zoning regulations." *S & R Dev. Estates, LLC v. Bass*, 588 F. Supp. 2d 452, 461 (S.D.N.Y. 2008). Even if a plan has been submitted and rejected, a claim is not ripe until the "property owner submit[s] at least one meaningful application for a variance." *Murphy v. New Milford Zoning Comm'n*, 402 F.3d 342, 348 (2d Cir. 2005). Four considerations undergird the requirement that plaintiffs seek a variance before requesting relief from a federal court: (1) the need to develop a full record; (2) "only if a property owner has exhausted the variance process will a court know precisely how a regulation will be applied to a particular parcel;" (3) "a variance might provide the relief the property owner seeks without requiring judicial entanglement in constitutional disputes," thereby enforcing "the longstanding principle that disputes should be decided on non-constitutional grounds wherever

possible;" and (4) "[r]equiring a property owner to obtain a final, definitive position from zoning authorities evinces the judiciary's appreciation that land use disputes are uniquely matters of local concern more aptly suited for local resolution." *Id.* (citations omitted).

> Here, in relevant part, all that Plaintiff alleges is that
>
> On or about July 24, 2020, the [Village], acting under color of law, denied the Plaintiff the right to post a Banner on the side his building, after the Plaintiff submitted an application to the [Village] to do same. Defendant permits others to attach Banners on the side of their buildings, notably 155 West Main Street, Walden, NY (a neighbor of the Plaintiff). Upon information and belief, said neighbor is white and not of foreign nationality.

(Compl. ¶ 90.) Nowhere in that allegation does Plaintiff provide any details about, for example: when he submitted such application, what he wrote was his asserted purpose behind posting the banner, the reasons the Village provided as the basis for the denial, whether he appealed the Village's decision, etc. Plaintiff neither provides his written application nor the Village's written denial as exhibits accompanying his opposition papers. If anything, Plaintiff's sole relevant allegation is wholly conclusory and insufficient on its face.

Even when drawing all inferences in his favor, Plaintiff at best alleges some kind of informal application to Defendants to post a banner on the side of the building in the Property. Yet, absent any allegations of a meaningful application, Plaintiff's "[i]nformal efforts . . . are insufficient, by themselves, to constitute final government action." *Goldfine v. Kelly*, 80 F. Supp. 2d 153, 160 (S.D.N.Y. 2000) (citations omitted).

In response, Plaintiff argues that the futility exception applies here because, as he alleges throughout the Complaint, the Village would have denied any formal application based on his longstanding issues with Defendants and their alleged discriminatory animus against him based on his race and national origin. (Resp. in Opp'n at 24–26.) But the Court disagrees.

To be sure, courts recognize one exception permitting federal court review of a non-final decision—"if pursuing an appeal to a zoning board of appeals or seeking a variance would be futile." *Murphy*, 402 F.3d at 349. This occurs when "a zoning agency lacks discretion to grant variances or has dug in its heels and made clear that all such applications will be denied." *Id.* But courts have interpreted this futility exception narrowly. *Missere v. Gross*, 826 F. Supp. 2d 542, 555 (S.D.N.Y. 2011). "Although the precise contours of the futility exception are not well-defined, courts in the Second Circuit have recognized that mere allegations of open hostility are not sufficient to invoke the futility exception." *Norwood v. Salvatore*, No. 12-cv-1025, 2015 WL 631960, at *5 (N.D.N.Y. Feb. 13, 2015) (internal citations and quotations omitted); *Osborne v. Fernandez*, No. 06-cv-4127, 2009 WL 884697, at *6 (S.D.N.Y. Mar. 31, 2009), *aff'd*, 414 F. App'x 350 (2d Cir. 2011) (rejecting futility argument based on allegations that "defendant decisionmakers were hostile to plaintiffs' proposed development or act[ed] in bad faith"). It is a "high standard" met only "when the government's actions are so unreasonable, duplicative, or unjust as to make the conduct farcical." *Sherman v. Town of Chester*, 752 F.3d 554, 563 (2d Cir. 2014).

Here, even when drawing all inferences in his favor, the Complaint fails to allege that, in denying Plaintiff's purported application, the Village's actions "are so unreasonable, duplicative, or unjust as to make the conduct farcical." *Sherman*, 752 F.3d at 563. "Absent such allegations, the noted disagreement [between Plaintiff and Defendants] is not enough, by itself, to demonstrate futility." *Lost Trail LLC v. Town of Weston*, 289 F. App'x 443, 445 (2d Cir. 2008). As such, Plaintiff fails to meet his burden in establishing the "high standard" of the futility exception.

Therefore, the Court concludes that Plaintiff's relevant claims are unripe. Accordingly, the Court dismisses Plaintiff's claims under § 1983 based on alleged violation of his rights under the

Due Process and Equal Protection Clauses of the Fourteenth Amendment for denying his application to post a banner in July 2020.

## II.   Standing

Defendants next argue that despite having amended his Schedule B and Schedule C after the Bankruptcy Proceeding was reopened, Plaintiff still lacks standing to assert his remaining claims here—which are the same claims he failed to previously disclose in the Bankruptcy Proceeding and which this Court previously dismissed in a decision later affirmed by the Second Circuit. (*See* Mot. at 20–22.)  They argue that contrary to Plaintiff's representation that he "was granted relief to pursue causes of action on behalf of the Estate" (Compl. ¶ 2), the bankruptcy court's consent order expressly provides only that the parties acknowledged that the *Isnady I* claims "are property of [Plaintiff's] Chapter 13 Estate and that any proceeds therefrom shall be distributed to [Plaintiff's] creditors . . . ." (*Id.* at 20 (quoting Knowles Decl., Ex. Q).) After due consideration, while it agrees with Defendants about Plaintiff's representation, the Court disagrees with them regarding Plaintiff lacking standing to pursue the claims on behalf of the estate.

When a debtor files for bankruptcy protection, all of his assets at the time of the petition become property of the bankruptcy estate. *See* 11 U.S.C. § 541(a)(1). Such assets include "every conceivable interest of the debtor, future, nonpossessory, contingent, speculative, and derivative," including "causes of action owned by the debtor or arising from property of the estate." *Chartschlaa v. Nationwide Mut. Ins. Co.*, 538 F.3d 116, 122 (2d Cir. 2008) (per curiam) (internal quotation marks and alterations omitted); *see also Seward v. Devine*, 888 F.2d 957, 963 (2d Cir. 1989) (noting that all pre-petition claims belonging to the debtor "became property of the estate when [the debtor] sought protection under the bankruptcy laws").

Because 11 U.S.C. § 541 includes "causes of action possessed by the debtor at the time of filing," "a temporal line of demarcation defines which claims are in, and which are outside of, the

20

estate." *In re Vasquez*, 581 B.R. 59, 66 (Bankr. D. Vt. 2018). "[C]laims that accrue to the debtor postpetition generally will not adhere to the estate and remain actionable by the debtor." *Mendelsohn v. Ross*, 251 F. Supp.3d 518, 522 (E.D.N.Y. 2017) (citing *Bell v. Bell*, 225 F.3d 203, 215 (2d Cir. 2000)).

Regardless, to ensure that the trustee of the estate is able to pursue any claims belonging to the estate, the Bankruptcy Code requires a debtor to disclose all of its actual or potential claims for the duration of the bankruptcy proceeding. *See BPP Illinois, LLC v. Royal Bank of Scotland Group, PLC*, 13-CV-638 JMF, 2015 WL 6143702, at *5 (S.D.N.Y. Oct. 19, 2015), *aff'd*, 859 F.3d 188 (2d Cir. 2017) (quoting *Hamilton v. State Farm First & Cas. Co.*, 270 F.3d 778, 785 (9th Cir. 2001) (noting that the duty to disclose "does not end when the debtor files schedules, but instead continues for the duration of the bankruptcy proceeding," up until the bankruptcy case is closed (citing *In re Coastal Plains, Inc.*, 179 F.3d 197, 208 (5th Cir. 1999)))); *accord In re Arana*, 456 B.R. 161, 169 (Bankr. E.D.N.Y. 2011); *see also* Fed. R. Bank. P. 1009(a) (allowing amendment of schedules as a matter of course until the case is closed). "[A] debtor is obligated to disclose accrued causes of action even if the debtor does 'not know all the facts or even the legal basis for the cause of action; rather, if the debtor has enough information . . . prior to confirmation to suggest that it may have a possible cause of action, then that is a "known" cause of action such that it must be disclosed.'" *Sea Trade Co. v. FleetBoston Fin. Corp.*, No. 03–CV–10254 (JFK), 2008 WL 4129620, at *12 (S.D.N.Y. Sept.4, 2008) (quoting *Coastal Plains*, 179 F.3d at 208).

This is because "[a]fter-acquired" property will vest in the estate if it is derived from property that was part of the estate as of the commencement of the bankruptcy. *Chartschlaa*, 538 F.3d at 122 (citing 11 U.S.C. § 541(a)(6) (making "[p]roceeds, product[s], offspring, rents or profits of or from property of estate" part of bankruptcy estate)). Put another way, "[p]ost-petition

property will become property of the estate if it is "sufficiently rooted in the pre-bankruptcy past." *Id.* (*Segal v. Rochelle*, 382 U.S. 375, 380 (1966) (interpreting Bankruptcy Act of 1898)).  Hence, "full disclosure by debtors is essential to the proper functioning of the bankruptcy system," *id.*, because "[t]he disclosure requirement allows the trustee and the creditors to determine whether the assets, including causes of action, should be pursued on the creditors' behalf," *In re Costello*, 255 B.R. 110, 113 (Bankr. E.D.N.Y. 2000).

To that end, "the Bankruptcy Code severely penalizes debtors who fail to disclose assets[.]" *Chartschlaa*, 538 F.3d at 122. Specifically, the Bankruptcy Code provides that "[w]hile properly scheduled estate property that has not been administered by the trustee normally returns to the debtor when the bankruptcy court closes the case, undisclosed assets automatically remain property of the estate after the case is closed." *Id.* (citing 11 U.S.C. § 554(c), (d)). "[I]ndeed, unless it is administered or abandoned by the trustee, the [undisclosed] action remains property of the estate 'forever.'" *In re Arana*, 456 B.R. 161, 170 (Bankr. E.D.N.Y. 2011) (quoting *In re Lopez*, 283 B.R. 22, 28 (Bankr. App. 9th Cir. 2002)). This penalty serves to prevent a debtor from first concealing assets "and then, upon termination of the bankruptcy case," utilizing the assets for his own benefit. *Chartschlaa*, 538 F.3d at 122 (citations omitted).

With all that in mind, it follows that even causes of action accruing post-petition, if left undisclosed during the pendency of the bankruptcy petition, such causes of action are deemed property of the estate and will "remain property of the estate [even] after the [bankruptcy proceeding] is closed." *Isnady I*, 2019 WL 3252753, at *5 (S.D.N.Y. July 19, 2019), *aff'd*, 799 F. App'x. 91, 92 (2d Cir. 2020) (unpublished) ("The [undisclosed] causes of action thus belong to the bankruptcy estate, not to Isnady."); *see also In re Waldron*, 536 F.3d 1239, 1242 (11th Cir. 2008) ("We conclude, based on the plain language of [11 U.S.C. §] 1306(a), that Mr. Waldron's

[undisclosed postpetition] claims are property of the estate. Mr. Waldron acquired his claims for underinsured-motorist benefits after the commencement of the Waldrons' bankruptcy case but before their case was dismissed, closed, or converted."); *In re Furgeson*, 263 B.R. 28, 34 (Bankr. N.D.N.Y. 2001) ("[T]he Debtors' causes of action arose post-petition and the respective cases have yet to be closed, dismissed or converted. Consequently, if the Court were to rely solely on the provisions of Code § 1306(a), the settlement proceeds derived from the settlement of those causes of action are property of the Debtors' estates."); 11 U.S.C. § 1306(a) ("Property of the estate includes, in addition to the property specified in section 541 of this title . . . all property of the kind specified in such section that the debtor acquires after the commencement of the case but before the case is closed . . . .").

Here, a review of the timeline of events establishes that all of Plaintiff's remaining claims here have belonged and continue to belong the Chapter 13 estate. To begin, the Complaint reveals that only one of Plaintiff's claims accrued before he commenced the Bankruptcy Proceeding in January 2015—namely, his § 1983 claim for the alleged violations of his rights under the Equal Protection Clause of the Fourteenth Amendment for selective enforcement of the Municipal and Zoning Codes that prohibited him from using the Property's driveway for certain uses beginning since 2001. (*See* Compl. ¶¶ 48–53.) All other remaining claims accrued after Plaintiff commenced the Bankruptcy Proceeding as early as June 2015. (*See* Compl. ¶¶ 54–85.)

As such, at the commencement of the Bankruptcy Proceeding in January 2015, Plaintiff's selective enforcement claim belonged to the Chapter 13 estate. Yet, Plaintiff failed to disclose the selective enforcement claim in the schedules he attached to his Petition at the commencement of the Bankruptcy Proceeding. Further, while the other remaining claims here—which accrued postpetition as early as June 2015—*initially* belonged to Plaintiff, because he failed to disclose

them while the Bankruptcy Proceeding remained pending, then such claims became property of the Chapter 13 estate. Accordingly, given that all of Plaintiff's remaining claims here are substantially the same as those he asserted in *Isnady I* (all of which arose from the same occurrences giving rise to the State Action), as the Second Circuit concluded: "[t]he causes of action belong to his bankruptcy estate, not to [Plaintiff]." *Isnady I*, 799 F. App'x at 92.

Indeed, when the bankruptcy court reopened the Bankruptcy Proceeding in April 2019, Plaintiff himself expressly conceded the same after he acknowledged that the remaining claims here "are property of [his] Chapter 13 Estate and that any proceeds received therefrom shall be distributed to [his] creditors in accordance with the debtor's confirmed Chapter 13 Plan and the United States Bankruptcy Code, less any sums that are exempted by the debtor upon the filing of [Plaintiff's] Amended Schedule 'C'." (Knowles Decl., Ex. Q.)

Nonetheless, Plaintiff contends that he has standing to maintain these claims against Defendants *on behalf of the Chapter 13 estate*. (Resp. in Opp'n at 12–13.) He contends that per the bankruptcy court's consent order, the trustee of the Chapter 13 estate consented to reopening the Bankruptcy Proceeding so that Plaintiff could amend his schedules and pursue the remaining claims here on behalf of the estate. (*Id.* at 9–10; *see also* Compl. ¶ 2 ("By Order of the United States Bankruptcy Court for the Southern District of New York, dated April 1, 2020, the Plaintiff was granted relief to pursue causes of action on behalf of the Estate) . . . .").)  In support, Plaintiff submits a copy of the transcript of the bankruptcy court's hearing concerning his motion to reopen the Bankruptcy Proceeding, in which counsel for the trustee attended. (*See* Haberman Decl., Ex 1, ECF No. 31-1.) However, after reviewing the relevant documents, the Court disagrees with Plaintiff's characterization.

Notably, nowhere do the relevant documents make any mention of Plaintiff seeking to reopen the Bankruptcy Proceeding based on his desire pursue the remaining claims here on behalf of the estate. Instead, all that the relevant documents show is that Plaintiff sought to reopen the Bankruptcy Proceeding so that he could amend the schedules and include the State Action, *Isnady I*, and the unrelated personal injury claim, but nothing else. (*See, e.g.*, Knowles Decl., Ex. N (Pl.'s Mot. to Reopen Bankr.) at 16 ("[T]he debtor wishes to reopen his case in order to permit the debtor to amend the debtor's Schedule 'B.'"); *id.*, Ex. P (Pl.'s Aff. in support of Mot. to Reopen Bankr.) at 7 ("WHEREFORE, I respectfully request the entry of an Order Reopening my case for the purpose of permitting me to amend Schedule 'B' filed with my petition; and for such other and further relief as to [sic] the Court may seem just and proper."); *id.*, Ex. Q (Consent Order) at 1 ("Upon the motion of [Plaintiff] . . . for an Order reopening the case . . . to permit [him] to amend [his] Schedule 'B' and Schedule 'C' . . . ."); Haberman Decl., Ex. 1 (Hearing Tr.).)

Notwithstanding, the Court concludes that Plaintiff does have standing to pursue the remaining claims here on behalf of the Chapter 13 estate. To be sure, in *Isnady I*, the Court disagreed with Plaintiff that the holding in *Olick v. Parker & Parsley Petroleum Co.*, 145 F.3d 513 (2d Cir. 1998), namely, "that a Chapter 13 debtor, unlike a Chapter 7 debtor, has standing to litigate causes of action that are not part of a case under title 11," *id.* at 515, did not apply in *Isnady I*. *See Isnady I*, 2019 WL 3252753, at *5. That was because Plaintiff brought his claims specifically for "monetary damages" in excess of $3,000,000.00 *on his own behalf and for his sole benefit*. *Id.* at *6. Indeed, the Court wrote that by his claims, Plaintiff could have sought equitable relief, for which it would have been permissible for him to bring such claims on his own behalf. *Id.* Yet, Plaintiff did not seek any equitable relief in *Isnady I* and instead "only affirmatively [sought] monetary damages" without having disclosed the relevant claims to the Chapter 13 estate. *Id.*

However, the instant case is distinguishable because here, unlike in *Isnady I*, Plaintiff is affirmatively asserting the claims here on behalf and for the benefit of the Chapter 13 estate. (*See* Compl. ¶ 2 (acknowledging that "any proceeds received [from the instant case] shall be distributed to [Plaintiff's] creditors in accordance with [Plaintiff's] confirmed Chapter 133 Plan and the United States Bankruptcy Code, less any sums that are exempted by [Plaintiff] upon the filing of [his] Amended Schedule 'C'."). Hence, the Court concludes that *Olick* applies here, and thus, Plaintiff has standing—concurrent with that of the trustee—to maintain the remaining claims on behalf of the estate. *See Olick*, 145 F.3d at 515–16 (holding that a Chapter 13 debtor has standing, concurrent with that of the trustee, to bring a cause of action on behalf of the estate); *see also Wilson v. Dollar General Corp.*, 717 F.3d 337, 343 (4th Cir. 2013) (same); *Smith v. Rockett*, 522 F.3d 1080, 1082 (10th Cir. 2008) (same); *Looney v. Hyundai Motor Mfg. Alabama, LLC*, 330 F. Supp. 2d 1289, 52 (M.D. Ala. 2004) (same); *Cable v. Ivy Tech State College*, 200 F.3d 467, 470 (7th Cir. 1999), *overruled on other grounds by Hill v. Tangherlini*, 724 F.3d 965 (7th Cir. 2013).

## III.   Judicial Estoppel

But even then, the Court agrees with Defendants that Plaintiff is judicially estopped from bringing his remaining claims.

The equitable doctrine of judicial estoppel can be invoked at a court's discretion to prevent a party from "asserting a factual position in one legal proceeding that is contrary to a position that it successfully advanced in another proceeding." *New Hampshire v. Maine*, 532 U.S. 742, 750, (2001); *Rodal v. Anesthesia Grp. of Onondaga, P.C.*, 369 F.3d 113, 118 (2d Cir. 2004). The underlying goal of the doctrine is to "protect the integrity of the judicial process by prohibiting parties from deliberately changing positions according to the exigencies of the moment." *New Hampshire*, 532 U.S. at 750.

26

In the bankruptcy context, judicial estoppel is frequently invoked to prevent a party who fails to disclose a claim in bankruptcy proceedings from asserting that claim after discharge. *Ibok v. SIAC-Sector Inc.*, No. 05-cv-6584 (GBD) (GWG), 2011 WL 293757, at *20 (S.D.N.Y. Jan. 27, 2011) (internal quotation marks and citation omitted); *see also Negron v. Weiss*, 2006 WL 2792769, at *3 (E.D.N.Y. Sept. 27, 2006); *Coffaro v. Crespo*, 721 F. Supp. 2d 141, 145 (E.D.N.Y. 2010). Because the integrity of the bankruptcy system depends on full and honest disclosure by debtors of all of their assets, a debtor is not permitted to obtain relief from the bankruptcy court by representing that no claims exist and then subsequently assert those claims for his own benefit in a separate proceeding. *Ibok*, 2011 WL 293757, at *20.

However, if the failure to disclose results from a "good faith mistake or an unintentional error," judicial estoppel does not apply. *Id.* at *21 (quoting *Mitchell v. Washingtonville Cent. Sch. Dist.*, 190 F.3d 1, 6 n.2 (2d Cir. 1999)). Because the Second Circuit has not established a standard for when to apply the good faith exception, district courts in this Circuit have referenced other circuit courts' rulings and held that "failure to disclose assets will only be deemed inadvertent or due to mistake when either the debtor has [1] no knowledge of the claims or [2] no motive to conceal the claims." *Azuike v. BNY Mellon*, 962 F. Supp. 2d 591, 599 (S.D.N.Y. 2013) (quoting *Coffaro*, 721 F. Supp. 2d at 146; *see also Ibok*, 2011 WL 293757, at *22.

### A.    Good Faith Exception

Here, as in *Isnady I*, Plaintiff contends that his failure to list his remaining claims on the schedules in the Bankruptcy Proceeding was inadvertent. (Resp. in Opp'n at 14–15.) However, unlike in *Isnady I*,[5] Plaintiff here claims that he did not purposefully omit the litigation claims on

---

[5] In *Isnady I*, Plaintiff posited a different explanation as to why he inadvertently failed to disclose the relevant claims: he averred "that he was advised by his bankruptcy attorney that he did not have to list his federal cause of action in his bankruptcy proceeding because he had not yet filed the action, and that he was unaware that his schedules needed to be amended after the filing." *Isnady I*, 2019 WL 3252753, at *7.

his schedules because he "was only obligated to list 'suits and administrative proceedings to which the debtor is or was a party within **one year** immediately preceding the filing of this bankruptcy case." (*Id.* at 15 (bold in original) (quoting Knowles Decl., Ex. G at 28, ECF No. 28-7).)

But the Court is of the view that Plaintiff's contention fails to establish that there was good faith to justify his failure to disclose. To begin, by his argument, Plaintiff concedes that he had knowledge of the relevant claims during the pendency of the Bankruptcy Proceeding. If anything, Plaintiff seems to posit that he actually did not fail to disclose anything as he "was only obligated to list" suits to which he was a party "within one year immediately preceding the filing" of the Bankruptcy Proceeding. (Resp. in Opp'n at 15 (quoting Knowles Decl., Ex. G at 28).) But as the Court discussed above, the duty to disclose any claims—even those accruing post-petition—"does not end when the debtor files schedules, but instead continues for the duration of the bankruptcy proceeding," up until the bankruptcy case is closed. *Hamilton*, 270 F.3d at 785 (citing *Coastal Plains, Inc.,* 179 F.3d at 208); *accord Arana*, 456 B.R. at 169; *see also In re Lowery*, 398 B.R. 512, 515 (Bankr. E.D.N.Y. 2008) (noting that the debtor's duty to disclose "is a continuing one and does not end with the filing of the bankruptcy petition."). Indeed, and perhaps most notably, Plaintiff did in fact fail to disclose the one claim that accrued *before* he commenced the Bankruptcy Proceeding: namely, his § 1983 claim for the alleged violations of his rights under the Equal Protection Clause of the Fourteenth Amendment for selective enforcement of the Municipal and Zoning Codes that prohibited him from using the Property's driveway for certain uses beginning since 2001. (*See* Compl. ¶¶ 48–53.)

Further, as to whether Plaintiff had a motive to conceal the claims, as the Court held in *Isnady I*: "the concealment of [Plaintiff's] claim[s] . . . would put any recovery on the claim beyond the reach of his creditors," which creates an incentive for him to conceal the claims. *Isnady I*, 2019

WL 3252753, at *7. "Had the trustee known about the[se] claim[s], [he] might have attempted to sell the claim or to have extracted a settlement from the defendants in this case for the benefits of [Plaintiff's] creditors." *Ibok*, 2011 WL 293757, at *24.

To be sure, the circumstances here differ from those in *Isnady I* because not only has Plaintiff successfully reopened the Bankruptcy Proceeding to amend the schedules and disclosed the relevant claims, but he is also bringing such claims on behalf of the Chapter 13 estate instead of his own behalf and for his sole benefit. Nonetheless, Plaintiff provides no argument as to how these circumstances establish that his failure to disclose the relevant claims (*i.e.*, the claim accruing pre-petition at the commencement of the Bankruptcy Proceeding and the post-petition claims during the pendency of the Bankruptcy Proceeding) is justified by good faith.

If anything, the timeline of events here indicates that Plaintiff made a gamble when pursuing the relevant claims in *Isnady I* on his own behalf and for his sole benefit before even seeking to reopen the Bankruptcy Proceeding to amend the schedules in December 2019 and later pursue the claims on behalf of the estate. Notably, the timeline of events indicates that Plaintiff maintained *Isnady I* on his own behalf and for his sole benefit all the way to appeal hoping a favorable ruling so that he would receive any monetary damages resulting from prosecuting the relevant claims.

For instance, in the affidavit he submitted to the bankruptcy court in support of his motion to reopen the Bankruptcy Proceeding, Plaintiff averred that "[i]t was not until after [he] commenced [*Isnady I*] and the motion to Dismissed was filed by the Village . . . that [he] became aware that it was necessary for [him] to have had the schedules amended to reflect the commencement of these law suits [sic]." (*See* Knowles Decl., Ex. P ¶ 13, ECF No. 28-16.) He further averred that "[u]pon finding out the same, [he] immediately contacted the firm Genova &

29

Malin and requested that it file a Motion Reopening [his] case to schedule these law suits [sic]." (*Id.* ¶ 14.)

Yet, the docket sheet for *Isnady I* shows that the Village sought leave to file a motion to dismiss based on Plaintiff's failure to disclose the relevant claims in *August 2018*, while the docket sheet for the Bankruptcy Proceeding shows that Plaintiff filed his motion to reopen the same *until December 2019*—a year and four months later. (*Compare Isnady I*, ECF No. 36, *with* Knowles Decl., Ex. O at 2–5.) As such, Plaintiff's assertions are wholly contradicted by his own court filings, which as noted above, indicates that he gambled all the way to appeal and only changed his position after his hopes to maintain the relevant claims on his own behalf and for his sole benefit faltered.

B.     *Judicial Estoppel Inquiry*

Additionally, after considering the three judicial estoppel factors, the Court concludes that estoppel is warranted here. Judicial estoppel will generally apply where (1) a party's later position is clearly inconsistent with its earlier position; (2) the party's former position has been adopted in some way by the court in the earlier proceeding; and (3) the party asserting the two positions would derive an unfair advantage or impose an unfair detriment on the party seeking estoppel. *See Edwards v. CGI Grp. Inc.*, No. 11-CV-8611, 2018 WL 4043142, at *4 (S.D.N.Y. Aug. 10, 2018) (internal quotation marks omitted). Because the purpose of judicial estoppel is to protect the integrity of the judicial process by prohibiting parties from deliberately changing positions according to the exigencies of the moment, "the Second Circuit limits judicial estoppel to situations where the risk of inconsistent results with its impact on judicial integrity is certain." *Azuike v. BNY Mellon,* 962 F.Supp.2d 591, 598 (S.D.N.Y. 2013) (alteration omitted) (quoting *Derosa v. Nat'l Envelope Corp.*, 595 F.3d 99, 103 (2d Cir. 2010) ).

      1.   <u>Inconsistent Position</u>

The first factor is whether Plaintiff's position in this proceeding is "clearly inconsistent" with his earlier position in the bankruptcy action. *DeRosa*, 595 F.3d at 103. As already mentioned above *ad nauseum*, the duty to disclose any claims—even those accruing post-petition—"does not end when the debtor files schedules, but instead continues for the duration of the bankruptcy proceeding," up until the bankruptcy case is closed. *Hamilton*, 270 F.3d at 785 (citing *Coastal Plains, Inc.,* 179 F.3d at 208); *accord Arana*, 456 B.R. at 169; *see also Lowery*, 398 B.R. at 515.

Here, although Plaintiff may have properly amended the schedules to disclose the relevant claim and is now pursuing them on behalf of the estate, his position in this case is at odds with the affidavit he filed in support of reopening his Bankruptcy Proceeding. As discussed above, Plaintiff here posits that he did not fail to disclose anything purposefully because in his bankruptcy petition, he "was only obligated to list" suits to which he was a party "within one year immediately preceding the filing" of the Bankruptcy Proceeding. (Resp. in Opp'n at 15 (quoting Knowles Decl., Ex. G at 28).) Yet, as noted above, Plaintiff did in fact fail to disclose one of his claims that accrued *before* he commenced the Bankruptcy Proceeding. (*See* Compl. ¶¶ 48–53.) Further, in his affidavit in support of reopening the Bankruptcy Proceeding, Plaintiff averred that "[i]t was not until after [he] commenced [*Isnady I*] and the motion to Dismissed was filed by the Village . . . that [he] became aware that it was necessary for [him] to have had the schedules amended to reflect the commencement of these law suits [sic]." (*See* Knowles Decl., Ex. P ¶ 13, ECF No. 28-16.) Hence, Plaintiff's positions are inconsistent because Plaintiff avers here that he was not required to disclose the relevant claims, when he had already previously averred that he learned about his duty to disclose these claims after the Village indicated so in its motion to dismiss in *Isnady I*.

Although on the surface this inconsistency may not seem as substantial as the one present in *Isnady I*, this inconsistency nonetheless retains the same crucial underpinning for which the

Court held Plaintiff was estopped from prosecuting *Isnady I*: that Plaintiff failed to disclose the relevant claims during the pendency of the Bankruptcy Proceeding and continued to pursue undisclosed claims on his own behalf and for his sole benefit despite learning that he was obligated to disclose them. *See, e.g.*, *Kunica v. St. Jean Fin., Inc.*, 233 B.R. 46, 58 n.4 (Bankr. S.D.N.Y. Apr. 28, 1999) ("[D]ebtors' failure to schedule their cause of action, and their subsequent prosecution of the same cause of action places them in a posture of fundamental inconsistency," estopping prosecution of that action); *Coffaro*, 721 F. Supp. 2d at 145–46 (debtor's failure to list claim for ownership of painting with bankruptcy court was inconsistent with later assertion of ownership in district court). Indeed, Plaintiff's position in this case suggests that Plaintiff still fails to recognize that he was prohibited from bringing the relevant claims on his own behalf and his sole benefit for failing to disclose them. Thus, the first factor weighs in favor of estoppel.

2.   Adoption of the Previous Position

The second factor guiding the judicial estoppel inquiry is whether Plaintiff's omission led the Bankruptcy Court to adopt his earlier and inconsistent position. *DeRosa*, 595 F.3d at 103. As relevant here, "[i]t is well established in the Second Circuit that a discharge of debts under § 727, together with the closing of a bankruptcy case without the distribution of an asset, constitutes an adoption of the position that the asset does not exist." *Edwards v. CGI Grp. Inc.*, No. 11-cv-8611 (AT), 2018 WL 4043142, *9 (S.D.N.Y. Aug. 10, 2018); *see also Azuike*, 962 F. Supp. 2d at 599 ("[T]he Bankruptcy Court adopted plaintiff's representation that such a claim did not exist when it discharged his debts and closed the bankruptcy case."); *Ibok*, 2011 WL 293757, at *7 ("The Bankruptcy Court, in discharging [plaintiff] and closing his case, adopted [his] stated position that he did not have any outstanding legal claims.").

As the Court concluded in *Isnady I*, Plaintiff pursued the relevant claims in *Isnady I* on his own behalf and for his sole benefit on March 26, 2018, approximately three weeks after a favorable

discharge and months prior to the Bankruptcy Proceeding's first closure on May 30, 2018. Yet, Plaintiff failed to include the relevant claims in the bankruptcy schedules until June 2020—three months after Plaintiff lost the appeal in *Isnady I* for lack of standing as he was pursuing the relevant claims—which belonged to the estate—on his own behalf and for his sole benefit. As such, the Court concludes that the second factor weighs in favor of estoppel.

            3.    Unfair Disadvantage

The third factor guiding the judicial estoppel inquiry is whether the party that asserts an inconsistent position derives an unfair advantage or imposes an unfair detriment on the party invoking estoppel. *DeRosa*, 595 F.3d at 103. Now that Plaintiff has amended the schedules to disclose the relevant claims, which he is now pursuing on behalf and for the benefit of the Chapter 13 estate, it cannot be said that he is preventing the trustee of the estate from "pursuing his claim for the benefit of his creditors while preserving his ability to recover on the claim himself." *Azuike*, 962 F. Supp. 2d at 599. In fact, the opposite seems to be true.

However, the Court still concludes that Plaintiff would gain an unfair advantage if he were allowed to pursue the relevant claims. Most notably, as Plaintiff's bankruptcy filings show, the Village is in fact Plaintiff's largest unsecured creditor, to which he owes $19,250 out of a total of $28,231 total unsecured debt. (*See In re Isnady*, Case No. 15-35042 (CGM), ECF Nos. 1 & 18 (Bankr. S.D.N.Y.).) Put differently, Plaintiff is purportedly pursuing the relevant claims here against the Village for the benefit of his creditors, which include the Village itself. This suggests that Plaintiff not only had a motive to deprive the Village of any potential proceeds resulting from any legal claims as it was one of his creditors, but also that he wanted to settle his debt with the Village through the relevant claims and have it pay for his other debts. This conclusion is supported once again by the fact that it was only after Plaintiff failed to obtain a favorable ruling from this Court and the Second Circuit for him to pursue the relevant claims on his own behalf and for his

sole benefit, that Plaintiff sought to disclose the relevant claims so that the Village could receive any proceeds resulting therefrom.

Further, nowhere in either the bankruptcy court filings or the filings here is there any indication that the trustee of Plaintiff's Chapter 13 estate had an opportunity to investigate Plaintiff's relevant claims against Defendants to find out if they have any value, and if so, to determine whether to prosecute it, settle it, abandon it, or approve Plaintiff's prosecution of the same in exchange for the estate receiving a share of the proceeds. *See, e.g.*, *Arana*, 456 B.R. at 170–71 ("The debtor or another party in interest may attempt to avert dismissal by seeking to reopen the bankruptcy case and amend the schedules to list the action so that 'a chapter 7 trustee can be appointed, investigate whether the [a]ction has value, and then prosecute it, settle it, abandon it, or arrange for [the debtor] to prosecute it in exchange for the estate receiving a share of the proceeds.' *Lopez*, 283 B.R. at 28. If it appears to the trustee that there may be a recovery and estate assets to distribute, then creditors can be notified, claims can be filed, and if all goes well, a distribution can be made to creditors.").

Simply put, there is no indication that Plaintiff consulted with the trustee regarding the merits and value of the relevant claims and whether him or the trustee should prosecute them, especially since Plaintiff is asserting these claims against one of the same creditors that would purportedly "benefit" from Plaintiff prosecuting such claims and receiving the requested monetary damages in the amount of $3,000,000. Hence, the third factor weighs in favor of estoppel.

### 4.   Judicial Integrity

Lastly, but perhaps most importantly here, the fourth factor guiding the judicial estoppel inquiry is whether "the risk of inconsistent results with its impact on judicial integrity is certain." *Azuike,* 962 F.Supp.2d at 598 (alteration omitted) (quoting *Derosa*, 595 F.3d at 103)).

34

As discussed above, "full disclosure by debtors is essential to the proper functioning of the bankruptcy system," *Chartschlaa*, 538 F.3d at 122, because "[t]he disclosure requirement allows the trustee and the creditors to determine whether the assets, including causes of action, should be pursued on the creditors' behalf," *Costello*, 255 B.R. at 113. It follows then, that if courts allow "a debtor to 'back-up, re-open the bankruptcy case, and amend his bankruptcy filings, only after his omission has been challenged by an adversary, [such approach] suggests that a debtor should consider disclosing potential assets only if he is caught concealing them.'" *Vanderheyden v. Peninsula Airport Comm'n*, No. 4:12cv46, 2013 WL 30065, at *14 (E.D. Va. Jan. 2, 2013) (quoting *Moses v. Howard Univ. Hosp.*, 606 F.3d 789, 800 (D.C. Cir. 2010)); *accord Azuike*, 962 F. Supp. 2d at 600. This is the exact approach Plaintiff is attempting here.

Again, the timeline of events here indicates that Plaintiff gambled all the way to appeal after failing to disclose the relevant claims and *only* changed his position after his hopes to maintain the relevant claims on his own behalf and for his sole benefit faltered. Therefore, were it to allow the relevant claims against Defendants to proceed, then the Court would be effectively ruling that a debtor who fails to disclose his legal claims in a bankruptcy proceeding could assert such claims on his own behalf and for his sole benefit, despite them potentially belonging to the bankruptcy estate, and roll the dice hoping no one would find out. And even if caught, the debtor could simply seek to amend his schedules and pursue the claims on behalf of the estate, *even months after being caught*, to "cure" any failure to disclose. Such ruling "would only diminish a debtor's incentive to provide a true and complete disclosure of her assets to the bankruptcy courts." *Vanderheyden*, 2013 WL 30065, at *14 (quoting *Moses*, 606 F.3d at 800); *accord Azuike*, 962 F. Supp. 2d at 599; *Isnady I*, 2019 WL 3252753, at *8. Thus, the fourth factor weighs in favor of estoppel.

Therefore, because Plaintiff fails to establish that the good faith exception applies here and all four factors in the judicial estoppel analysis weigh in favor of dismissal, the Court lacks jurisdiction over Plaintiff's remaining claims. Accordingly, the Court dismisses Plaintiff's all remaining claims against Defendants.

## CONCLUSION

For the foregoing reasons, the Court GRANTS Defendants' motion to dismiss and DISMISSES Plaintiff's Complaint without prejudice for lack of subject matter jurisdiction. The Clerk of Court is directed to terminate the motion at ECF No. 27 and this action, and to close this case accordingly.

Dated: August 19, 2022
      White Plains, NY

SO ORDERED:

_____

NELSON S. ROMÁN
United States District Judge